UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

P.R.C. on behalf of herself and her child,  G. G. C.,

Plaintiffs,

-against-

NEW YORK CITY DEPARTMENT OF
EDUCATION; NEW YORK CITY BOARD OF
EDUCATION; CARMEN FARINA, in her official
capacity as Chancellor of the New York City School
District,

Defendants.

Civ. No.

COMPLAINT

## PRELIMINARY STATEMENT

1.    This action is being filed by the parents of G.G.C., a five-year-old child, pursuant to the

due process clause of the 14th Amendment of the U.S. Constitution; 42 U.S.C. § 1983; the New

York State Constitution, and New York State Education Law §§ 3202, 3203.

2.    The parents of G.G.C. ("Parents" or "Plaintiffs") have filed this Complaint alleging that,

*inter alia*, New York State law and the New York City Department of Education ("DOE"),

Chancellor Carmen Farina ("Chancellor"), and the New York City Board of Education ("Board")

(collectively "Defendants" or the "DOE")) collectively created a property interest in G.G.C.'s

rights to (a) Sibling Priority Policy in relation to enrollment in public schools; and (b) participate

in the NYC Gifted and Talented Program ("G&T Program"), which is protected by the Due

Process Clause of the Fourteenth Amendment and that G.G.C. was denied her right to participate

in both the Sibling Priority and in the G&T Program without Due Process of law.

3.    Plaintiffs also allege pendency claims under New York State Education law, including,

*inter alia*, claims that Defendants' operation of the G&T Program is arbitrary and capricious.

4.     G.G.C. requires emergency relief; without intervention from this Court, G.G.C. will suffer irreparable harm.

5.     G.G.C. has tried to exhaust her administrative remedies, but due to delays and deficiencies in that process, the subject of which are being challenged in this action, she has not yet been able to secure relief.

## PARTIES

6.     Plaintiff, G.G.C., is five years old.

7.     G.G. C. is a child identified as "superior" or gifted and talented by the Stanford-Binet Intelligence Scales.

8.     P.R.C. is G.G.C.'s mother.

9.     P.R.C. and G.G.C. live in Manhattan with G.G.C.'s father and her brothers, C.C. and J.C.

10.     Initials are used throughout this Complaint to preserve the confidentiality of sensitive medical, educational, and disability-related information under the Family Educational Rights and Privacy Act of 1974 (FERPA).

11.     Defendant, CARMEN FARINA, is the Chancellor of the New York City School District ("the Chancellor") and as such is entrusted with the specific powers and duties set forth in N.Y. Educ. Law § 2590-h.

12.     Defendant, THE NEW YORK CITY BOARD OF EDUCATION ("the Board of Education" or "the Board"), was or continues to be the official body charged with the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York.

2

13.     Upon information and belief, Defendant, THE NEW YORK CITY DEPARTMENT OF EDUCATION ("Department" or "DOE"), claims to be and appears to have been delegated by the Chancellor the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities.  It is not clear that the Defendant is a legally formed independent entity, although it appears in lawsuits and claims to be a "municipal" corporation.

14.     Upon information and belief, Defendants are individually and/or jointly responsible for delivering educational services to children in New York City and operate the G&T Program.

## JURISDICTION & VENUE

15.      This Court has jurisdiction under 28 U.S.C. § 1331, in that claims are asserted under the laws of the United States; 28 U.S.C. § 1343(a), in that claims are asserted under laws providing for the protection of civil rights; under 42 U.S.C. § 1983, 28 U.C.S. § 1988, 42 U.S.C. § 12182.

16.     This Court has jurisdiction over Plaintiff's pendent State law claims pursuant to 28 U.S.C. § 1367.  Plaintiff also seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

17.      Venue is proper under 28 U.S.C. § 1391(b).

## GENERAL FACTS

**The Sibling Priority Policy**

18.     Defendants have adopted a Sibling Priority Policy for admissions to public schools.

19.     The Sibling Priority policy has been codified in Chancellor's Regulation A-101, which governs admissions processes. According to A-101, in order to be eligible, sets forth that: For purpose of assignment priority, a sibling is a brother or sister (including half-brothers, half-sisters,

3

stepbrothers, stepsisters, foster brothers, and foster sisters) of the applicant, who lives in the same household. Siblings of students already pre-registered or enrolled at an elementary school at the time of application submission are given sibling priority for admission into elementary school. GGC had the right to sibling priority under the Chancellor's Regulation A-101 standing alone.

20.     There is no separate regulation for G&T Program sibling priority and under the plain language of A-101, G.G.C. would be eligible to invoke Sibling Priority.

21.     According to Defendants, the Sibling Priority Policy system was instituted as a means to maintain family unity within schools and to relieve the financial and logistical burdens of families with two or more siblings who might otherwise have to attend different schools in different parts of New York City.

**The Gifted and Talented Program**

22.     Defendants operate the G&T Program.

23.     According to Defendants, New York City's G&T Program aims to deliver accelerated, rigorous, and specialized instruction aligned with the Common Core Learning Standards ("CCLS"). The CCLS were adopted in July 2010 with the understanding that New York State could add an additional 15% of NYS-specific standards in ELA and Mathematics. The Board of Regents approved the New York State P-12 Common Core Learning Standards in January 2011.

24.     The Common Core State Standards are fewer, clearer and higher than most state standards, and include rigorous content and application of knowledge through higher order skills.

25.     Students entering kindergarten through third grade are eligible to participate in G&T admissions.

4

26.    Upon information and belief, admission after kindergarten is rare because available spots in first through third grade usually become available through attrition.

27.    Defendants operate "District" G&T Program sites and "Citywide" G&T Program sites.

28.    District G&T Programs are offered within district elementary schools, and prioritize students who live in the local communities served by the school. District G&T Programs begin with kindergarten and end in the school's terminal grade. G&T students who attend District G&T Programs do so alongside students who are zoned or otherwise entitled to attend these public schools. Students in District G&T Programs are served together for major subject areas, but may be scheduled for other classes with students who are not in the program (e.g. physical education, art).

29.    Citywide G&T schools accept students from all boroughs, with no priority given for district of residence. All students in these schools are placed via the centralized G&T application and placement process; there are no zoned or otherwise entitled students attending these schools.

30.    In order to gain admission to the G&T Program, four-year-old students in New York City must take the G&T assessment.

31.    Upon information and belief, the admissions process for the 2015-2016 G&T Program utilized the same criteria that have been employed since 2007, when the G&T Program became centrally, rather than locally, administered. Since that time, students have been placed according to their percentile rank on G&T assessments, with eligible siblings of students currently enrolled in G&T Programs placed first, and the remaining seats then filled by eligible non-sibling applicants.

32.   Defendants' have adopted a G&T Sibling Priority Policy for admission to the G&T Program. The Sibling Priority policy has been codified in Chancellor's Regulation A-101, as well as the G&T Handbook, which is published annually by the Defendants.

33.   Pursuant to the G&T Sibling Priority Policy, an applicant to a G&T Program school whose sibling is pre-registered or enrolled at the school at the time of the application submission will be given priority placement at the school over other eligible students.

34.   For Citywide G&T Programs, siblings scoring at or above the 97th percentile will be placed first, by percentile rank. After all eligible siblings have been placed, non-sibling applicants will be placed by percentile rank.

35.   In order for a sibling to have an automatic priority to enroll in a Citywide G&T Program site, the sibling has to score at least in the 97th percentile or above on the Defendants' G&T assessment.

36.   The G&T assessments were held in January-February 2015.

37.   Scores on the G&T assessment were issued approximately two months later on April 6, 2015.

38.   Applications to G&T Programs for the 2015-2016 school year were due as of April 23, 2015.

39.   Although the application date has passed, upon information and belief, some G&T Programs, including the one at issue here, Anderson, will have open seats in September 2015 for eligible children. There is attrition in the students who accept the offered seats as well as a waitlist that is kept for these open seats, which is generally unfilled until after the first day of school when

6

it becomes clear how many seats are actually available for additional students. This year school will begin on September 9, 2015.

40.    However, these seats will be gone by approximately September 9, 2015, close of business, when the DOE determines how many seats are available in the Anderson kindergarten classes and offers them to new students.

41.    If a child fails to gain admission to the G&T Program in their kindergarten year, they are foreclosed from admission to the program for Kindergarten and likely will not receive a seat due to the scarcity of seats that become available due to attrition from 1st-3rd grade.

**Defendants' G&T Assessment**

42.    The Defendants' G&T assessment is comprised of two tests: a Verbal Assessment, the Otis-Lennon School Ability Test ("OLSAT"), and a Nonverbal Assessment, the Naglieri Nonverbal Ability Test ("NNAT").

43.    The OLSAT consists of thirty (30) verbal questions.

44.    The OLSAT is designed to measure verbal reasoning and comprehension skills that are most closely related to scholastic achievement. Tasks such as detecting likenesses and differences, recalling words and numbers, defining words, following directions, classifying, establishing sequence, solving arithmetic problems, and completing analogies are included because they have been shown to be valid measures of logical reasoning abilities. Children's abstract thinking and reasoning skills are also measured to gain understanding of their relative strengths and weaknesses in performing a variety of reasoning tasks.

45.    The NNAT consists of forty-eight (48) nonverbal questions.

7

46.   The NNAT is designed to measure nonverbal reasoning skills and general problem-solving ability without the use of language. Tasks such as completing patterns, sequencing, and connecting ideas are included because they have been shown to be a valid measure of problem-solving abilities, regardless of a student's primary language, socioeconomic background, culture, or prior academic experience.

47.   After students take the assessments, they are scored and each student is assigned a percentile rank. The percentile rank refers to a student's relative standing in comparison to other students of the same age. For example, a student scoring in the 99th percentile displays a level of giftedness that is higher than 99% of his or her same-aged peers. Given the young age of students tested for kindergarten G&T seats, each child is compared only to students within the same three-month age band, rather than all students in the grade.

48.   The Defendants score each test based on the student's "age at the date of testing" and, along with a percentile rank, they include a weighted score.

49.   Together, the OLSAT and NNAT are weighted 50% each, and are combined to make up a student's "combined percentile rank."

50.   Due to the limited number of G&T seats and the large number of students who are eligible to apply for the G&T Program, the Defendants have conducted lotteries for children who qualify for admission into all Citywide and some District G&T Programs.

51.   Among students with a given percentile rank, the lotteries determine which students receive offers to G&T Programs.

52.    In Citywide G&T Programs, siblings who score in the 99th percentile are given priority for admission.  Afterward, students who score in the 98th percentile are admitted, followed by those students who scored in the 97th percentile.  If seats are left, all other eligible students have a chance to be admitted.  Within each percentile group, G&T Program applicants are ranked based upon a random lottery number.

53.    However, there are not enough seats to accommodate the admissions and, upon information and belief, only children who score 99th percentile typically gain access to NYC G&T programs.

**Test Administration Protocols**

54.    Defendants do not make test administration protocols and procedures public to parents prior to the G&T assessments.

55.    Parents are not present during administration of the assessments.

56.    The individuals who administer the tests ("Proctors") are not permitted to speak to parents about any substantive or administration issue that arises during the test and do not describe the testing administration or conditions to Parents of eligible students.

57.    The G&T assessments were held in January-February 2015.

58.    Scores on the G&T assessment were issued approximately two months later on April 6, 2015.

59.    The Pearson Education Company ("Pearson"), is a private corporation that develops the G&T assessments for the Defendants.

60.    Pearson provides consultation to the Defendants regarding the G&T assessments and also scores assessments using the same "age at the date of testing," percentile rank, and weighted score.

61.    Applications to G&T Programs for the 2015-2016 school year were due as of April 23, 2015.

62.    Although the application date has passed, upon information and belief, some G&T Programs, including the one at issue here, Anderson, will have open seats in September 2015 for eligible children, as there is attrition in the students who accept the offered seats and a waitlist is kept for these open seats that is unfilled generally until after the first day of school when it becomes clear how many seats are actually available for additional students. This year school will begin on September 9, 2015.

63.    However, those seats will be gone by September 9, 2015, close of business.

**Process of Score Release and Test Review**

64.    When G&T assessment results are released to parents, they only include percentile scores. Parents are not provided access to the test questions, answers or protocols.

65.    In order to view a copy of the G&T assessment, a parent must make a written request to Defendants.

66.    The Defendants provide appointments for test review in June of each year.

67.    This year, Defendants allowed parents to make appointments to review G&T assessments in June of 2015.

68.    However, this right to review the G&T test occurs after the applications to G&T Programs are already due and deadlines are past.

10

**Defendants Have No Appeals Process or Due Process In Relation to the G&T Program or the Sibling Priority Policy**

69.    Defendants have failed to ensure that there are legally sufficient due process procedures in relation to the Sibling Priority Policy generally and the G&T Program admission process.

70.    Defendants have no due process procedures or appeals process incorporated into A-101 for the Sibling Priority Policy or the G&T Sibling Priority Policy.

71.    Further, Defendants do not have any due process procedures or appeals process for the G&T assessment or program admission process that can be invoked following the initial issuance of the scores.

72.    Defendants have only a limited review process for the G&T assessment, but it must be invoked 48 hours within the completion of the administration of the G&T assessment (the "48 Hour Procedure"), well before parents receive any scores and/or before they have notice of the details of the G&T assessment protocols.

73.    Moreover, Defendants fail to provide parents with adequate notice of the existence of and access to the 48 Hour Procedure.

## SPECIFIC FACTS

74.    G.G.C. is the sister ("sibling") of C.C., who is a student in Citywide G&T Program at the Anderson School, P.S. 334 ("Anderson").

75.    According to the plain language of Chancellor's Regulation A-101, as a sibling of C.C., G.G.C. had the right to enroll in Anderson provided she met the eligibility criteria set forth in A-101. According to A-101, in order to be eligible, sets forth that: For purpose of assignment priority, a sibling is a brother or sister (including half-brothers, half-sisters, stepbrothers,

11

stepsisters, foster brothers, and foster sisters) of the applicant, who lives in the same household. Siblings of students already pre-registered or enrolled at an elementary school at the time of application submission are given sibling priority for admission into elementary school. GGC had the right to sibling priority under the Chancellor's Regulation A-101 standing alone.  There is no separate regulation for G&T Program sibling priority and under the plain language of A-101, G.G.C. would be eligible.

76.   According to Defendants, the Sibling Priority Policy system was instituted as a means to maintain family unity within schools and to relieve the financial and logistical burdens of families with two or more siblings who might otherwise have to attend different schools in different parts of New York City.

77.   As a sibling of C.C., G.G.C. had the right to enroll in Anderson in September 2015 based upon the plain language of that regulation, which is binding on Defendants.

78.   Alternatively, as a gifted student and a sibling of C.C., G.G.C. had a right to invoke Sibling Priority and gain admission to Anderson, provided that she scored in 97th percentile or above on the Defendants' combined G&T assessment.

79.   On November 7, 2014, G.G.C. took the Stanford-Binet Intelligence Scales test ("Stanford-Binet") for admission to another school program.

80.   The Stanford-Binet is a standardized test that assesses intelligence and cognitive abilities of children and adults aged two to twenty-three and is the test to determine an individual's "IQ score." It tests intelligence across four areas: verbal reasoning, quantitative reasoning, abstract/visual reasoning, and short-term memory. The areas are covered by several subtests,

including vocabulary, comprehension, verbal absurdities, pattern analysis, matrices, quantitative, number series, memory for sentences, memory for digits, and memory for objects. The test has a mean, or average, standard score of 100 and a standard deviation of 16 (subtests have a mean of 50 and a standard deviation of 8).

81.    Upon information and belief, the Stanford-Binet is known in the education community as a superior assessment of intelligence across age, abilities, and ethnicity and is used to determine an individual's IQ score.

82.    G.G.C. scored in the "superior" or gifted range on this test of cognitive potential.

**G.G.C.'s G&T Assessment Administration**

83.    On February 1, 2015, Defendants assessed G.G.C. for admission to the G&T Program for the 2015-2016 school year.

84.    At the time, G.G.C. was four-years-old.

85.    Prior to the administration of the assessment, the Defendants had not provided G.G.C.'s parents with information about the protocols for administering the assessment for admission to the G&T Program for the 2015-2016 school year.

86.    Although C.C. had taken the G&T assessment [three] years ago, G.G.C.'s parents were never provided information about the administration of the tests and did not review the test taken by C.C.

87.    On the day of the test, her father, D.C., took G.G.C. to Chelsea Prep for her to be tested.

13

88.   Defendants' Proctor picked G.G.C. up from the waiting area in the school auditorium, where she sat with D.C. at 10:38a.m.  The Proctor picked G.G.C. up with the rest of the approximately 10 children who were being tested on that day.

89.   The Proctor brought G.G.C. to the testing room in another part of the school, without her parent.

90.   D.C. was not present during any part of the testing.

91.   Approximately 42 minutes after G.G.C. was picked up from D.C., the Defendants' Proctor brought G.G.C. back down to D.C.

92.   At the same time that G.G.C. was brought back downstairs following her test, all of the other children tested, were also brought back downstairs to meet their Parents.

93.   Thus, upon information and belief, Defendants started and stopped the G&T assessment at the same time for all of the children who took it during the 10:30 a.m. timeslot when G.G.C. was assessed.

94.   At the time that the G&T assessment was administered to G.G.C, Defendants had not provided her parents with any notice of (a) testing protocols; (b) what might constitute signs of errors in administration; or (c) notice of any appeals process or the 48 Hour Procedure.

95.   At the time of testing, neither Parent could have been aware of any errors in administration, testing, or scoring that the Defendants (and/or Pearson acting as Defendants' agent) could have made. On April 6, 2015, the Parents received G.G.C.'s G&T assessment scores via email.

14

96.   Although G.G.C. had scored in the superior range on the verbal reasoning portion of the prior Stanford-Binet, she only scored in the 73rd percentile on the OLSAT test.  Predictably, however, she scored in the 99th percentile on the NNAT test.

97.   As a result, G.G.C. only received a combined percentile rank in the 93rd percentile for the G&T assessment.

98.    This score made her ineligible for Sibling Priority and admission into Anderson, located in the "Shea Complex".

99.   The Shea Complex school building is located at 100 W. 77th Street in Manhattan. It houses two elementary schools; PS.452 and Anderson."

100.  Since the time that the Parents received the scores, they have attempted numerous avenues to try to obtain due process and/or a fair review and appeals process to investigate and address potential errors in the administration and scoring of the G&T assessment and their denial of access to the Sibling Priority Policy contained in Chancellor's Regulation A-101.

101.  Defendants have denied the parents due process of law and a fair review and appeals process.  Thus, the Parents' efforts to obtain a legally sufficient review and to address significant issues in the administration and scoring of the test, have not been successful.

102.  Without this Court's intervention, Plaintiffs will suffer irreparable harm. Plaintiffs will lose their right to invoke the Sibling Priority Policy, as well as the G&T Sibling Priority Policy.  In addition, G.G.C. will suffer irreparable harm, as she will lose the opportunity to participate in the Defendants' G&T Program in the 2015-2016 school year and will likely lose the opportunity to participate in the Defendants' G&T Program forever.

**Parents' Efforts to Obtain Due Process**

103.  After receiving G.G.C.'s scores on April 6, 2015, the Parents immediately emailed Daniel Hildreth, Director of Defendants' office of Gifted and Talented Enrollment, to inquire about the serious discrepancies they noticed in G.G.C.'s scores.

104.  In response, and, upon information and belief, without any specific investigation into G.G.C.'s scores, Defendants sent a boilerplate email stating only that the scores were calculated properly.

105.  The DOE's emails further indicated that the only opportunity for the Parents to have questioned the test would have been via the 48 Hour Procedure.

106.  The Parents specifically tried to avail themselves of the DOE's appeal process at this time and were told that they would have had to commence their appeal two months before they knew their daughter's assessment results.

107.  In late April 2015, Defendants agreed to have a phone call with the Parents.

108.  On April 14, 2015, the Parents spoke with Mr. Anthony Benners and Amy Hilbraugh, from the Defendants' Statistical and Assessment units, respectively.

109.  During that phone call, the Defendants merely explained the Defendants' generic scoring process utilizing G.G.C.'s raw scores.

16

110.  Defendants did not consider and/or review any specific claims by the Parents or challenges in relation to the scoring, methodology or administration of the assessment at this time.

111.  After this telephone call, on April 23, 2015, the Parents then sent an email to Gloria Gonzalez, Anthony Benners, Amy Hilbraugh and Daniel Hildreth. (The "April 2015 Email").  This email included specific questions about G.G.C.'s assessment.  In particular, the Parents asked about an improper age band utilized for scoring G.G.C. test as well as lack of breaks during the administration of the test and specific OLSAT policy dictated by the Pearson creators of the exam. The Parents requested that G.G.C be provided the opportunity to re-take the test given appropriate protocols and accurate scoring methodology.

112.  Defendants never responded to the "April 2015 Email."

113.  Subsequently, on May 6, 2015, the Parents filed a petition with the Commissioner of the New York State Education Department ("Commissioner") pursuant to N.Y. Education Law § 310 and 8 NYCRR §§ 275-276 ("Petition"). As part of the Petition, the Parents requested an immediate stay from the Commissioner, given that the deadline for the Defendants' G&T application process was April 23, 2015.

114.  The Commissioner did not grant a stay and provided no explanation for the decision.

115.  To date, the Commissioner has not issued any decision.

116.  The New York State Education law and regulations contains no time frame for the Commissioner to issue a final decision.

117.  A review of the Commissioner's decisions published online reveals that it can take the Commissioner several months (or even over one year) to issue a decision.

118.  On May 28, 2015, the Parents received an email from the DOE confirming their appointment to view G.G.C.'s G&T test and testing protocol. The Defendant's email expressly stated that "[the] test view appointment is not an appeal process, rather an opportunity to view the test."

119.  Further, the Parents were advised that they were not permitted to copy or take pictures of any portion of the exam and/or take notes of the review or discussion that ensued.

120.  On June 1, 2015, the Parents reviewed G.G.C.'s G&T test and test protocol with one of Defendants' employees, Luz Solomita, who works in Defendants' Office of Assessment.

121.  Ms. Solomita advised the Parents that she is a test Proctor and trainer for Proctors who administer the Defendants' G&T assessments.

122.  Ms. Solomita advised the Parents for the following:

       a.      G.G.C. should have been provided breaks during the test.

       b.      Children are entitled to a retest when the Defendants do not follow their own testing protocols and ensure that children take breaks during the administration of the G&T assessment.

123.  Ms. Solomita explained that there is a "breach" version of the test used in these circumstances.

124.  Ms. Solomita advised the Parents that, as part of Defendants' testing protocols and procedures, G&T Proctors are trained to provide a break at the following times:

       a.      Between the administration of the NNAT and OLSAT;

       b.      Whenever a child is not paying attention or loses focus and is fidgety;

18

       c.      Whenever a child starts to provide multiple incorrect answers

125.  Ms. Solomita further advised the Parents that, as part of the Defendants' protocol, Proctors are trained to direct "young" children to stretch, do exercises and use the bathroom in order to regain their focus and stamina.

126.  Ms. Solomita stressed the importance that she places on these strategies, especially as they relate to four- and five-year-old children.

127.  In addition to the Parents' discussions with Ms. Solomita, during the test and protocol review, they observed for themselves the above-referenced break protocols printed within the G&T test booklet ("Test Booklet") for Proctors to follow.

128.  For example, the Test Booklet contains a full paragraph instructing Proctors to provide children with a break in between administering the NNAT and OLSAT.

129.  In fact, there is a full page that contains a "STOP" sign to direct Proctors to afford students a break after the NNAT and prior to starting the OLSAT.

130.  The Test Booklet also contains written directions to the Proctors to provide a child with a break if they become frustrated, lose focus, or stop answering questions correctly.

**Errors In Administration and Scoring**

131.  Upon information and belief, Defendants have committed several errors of administration and scoring which entitle G.G.C. to a retest.

132.  First, G.G.C. was not provided any mandatory breaks.

133.  There were at least two times that G.G.C. was automatically required to be afforded breaks pursuant to the Defendants' testing protocols: (a) between the administration of the two

19

tests; and (b) upon the Proctors observation that she started to answer questions inaccurately during a portion of the NNAT.

134.   Upon information and belief, G.G.C. was not afforded either of these mandatory breaks.

135.   Further, G.G.C. was not allowed to take the test at her own pace.  The Test Booklet indicates that children will be allowed to take the entire G&T assessment at their own pace, as it is not a timed exam.  The Test Book states: "[a]ll children work at their own pace, provided they actively work on completing the exam" and "both assessments are untimed, which make requests for extended time unnecessary."

136.   Yet, upon information and belief, the protocol of the site where G.G.C. took the assessments required G.G.C. imposed a standard, external time-limit on the G&T assessment.

137.   This negatively impacted the results of G.G.C.'s testing; specifically the OLSAT test, as it was the last section of the testing administered to G.G.C.

138.   The basis of the Parents' belief about the external time limit is that G.G.C. was picked up by the Proctor and brought back down by the Proctor within the same time period as all of the other children present for the G&T test.

139.   In fact, G.G.C.'s testing process took approximately 40 minutes, beginning from the time the school coordinator picked G.G.C. up from the auditorium, among a group of approximately 10 students taking the test at the same time, until she was brought down with the same group of students.

140.  G.G.C. had less than 40 minutes to answer 78 questions, including the time it took her to walk with her group to the individual testing proctor and testing room, be read the testing directions, take the test, then be brought back, with her group to the school auditorium.

141.  Moreover, after the Parents received the test scores back, they discovered that G.G.C.'s age may have been incorrectly calculated for the purposes of scoring.  G.G.C. was scored against children aged "4.9" years old (i.e. four years and nine months old). However, upon information and belief, based on G.G.C.'s age, she should have been scored in relation to students in the "4.8" band (i.e. four years and eight months old).

142.  Upon information and belief, given her age at the time of the G&T assessment, the only way that G.G.C. would have been scored in relation to the 4.9 band was if Defendants decided (without notice to parents) to "round-up" student's ages, so as to decrease the number of eligible applicants to the G&T Programs in certain districts where high numbers of students were usually deemed eligible.

143.  Defendants did not provide notice to parents that it created any equation to round-up student ages in connection with the exam.

144.  Upon information and belief, Defendants did not generally round-up student ages in connection with this year's exam.

145.  Upon information and belief, as a result of this error, G.G.C. was compared to children between age 4.8 and 4.12 (i.e. between the ages of four years nine months and four years, twelve months), causing her test to be scored incorrectly.

146.  The error in scoring also affected her combined percentile rank.

147.   Upon information and belief, if this error was applied to other children (i.e. if G.G.C.'s scores were "rounded up" pursuant to a process in a particular district, borough or region), it impacts the validity of the G&T assessments for all of the 2015 test takers.

148.   In 2015, the number of kindergarten students who scored 97-99% to qualify for G&T dropped significantly – 40% in certain districts – as compared to the number of children last year who qualified.

149.   The DOE's age-band rounding consists only of rounding up, not rounding down, and thus it impacts only half of the children assessed. Two-thirds of the children that took the assessments stay in the same age-band after any rounding, but the other one-third are affected by being pushed into the next higher age band. As a result, these children, including G.G.C. are being scored against children who are older, against whom they should not be scored, as doing so contravenes the established test scoring methodology and is also patently unfair.

150.   Upon information and belief, the DOE did not utilize the national norms that it purports to utilize for the G&T assessment process.

151.   Upon information and belief, the DOE did not accurately or properly correlate the OLSAT and NNAT, resulting in assigning improper percentile rankings to students.

152.   Upon information and belief, the DOE did not accurately or properly norm the OLSAT this year for kindergarten testing, creating lower scores for children applying for the G&T Programs.

153.   Upon information and belief, G.G.C. had difficulty understanding her proctor on account of her accent.

154.  Upon information and belief, the proctor's accent prevented her from providing clear, appropriate, and valid directions on a test of verbal reasoning.

155.  Upon information and belief, this resulted in a lower raw score on G.G.C.'s OLSAT, which does not reflect her abilities or skills.

156.  Further, according to A-101, in order to be eligible, sets forth that: for purpose of assignment priority, a sibling is a brother or sister (including half-brothers, half-sisters, stepbrothers, stepsisters, foster brothers, and foster sisters) of the applicant, who lives in the same household. Siblings of students already pre-registered or enrolled at an elementary school at the time of application submission are given sibling priority for admission into elementary school. GGC had the right to sibling priority under the Chancellor's Regulation A-101 standing alone.  There is no separate regulation for G&T Program sibling priority and under the plain language of A-101, G.G.C. would be eligible.

**The Defendants' Inadequate Appeals Process**

157.  "A fundamental requirement of due process is 'the opportunity to be heard.' It is an opportunity which must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (*citing Grannis v. Ordean*, 234 U.S. 385, 394 (1914)).  Due process, however, "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961) (internal quotation marks omitted); *see Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). Rather, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972).

158.  As the Supreme Court has held, the essence of procedural due process is that a person must be afforded notice and an opportunity to be heard before government may deprive him of liberty or a recognized property interest. *See Memphis Light, Gas & Water Div. v Craft,* 436 U.S. 1, 9 (1978); *Board of Regents v Roth,* 408 U.S. 564, 577 (1972). Likewise, the "essence [of] the doctrine of substantive due process prevents the deprivation of life, liberty or property for arbitrary reasons." *Mallinckrodt Med Inc. v. Assessor of Town of Argyle,* 292 A.D.2d 721, 723, 740 N.Y.S.2d 467, 470 (3d Dept. 2002).

159.  As a sibling of C.C., G.G.C. has a property interest in the Sibling Priority Policy in under Chancellor's Regulation A-101, which affords her the right to attend the school that C.C. attends.

160.  The Defendants failed to afford G.G.C. her right to (a) Sibling Priority Policy; and (b) the G&T Sibling Priority Policy.

161.  As a gifted sibling of C.C., which affords her an automatic entry into the Anderson G&T Program upon her attainment of a particular score, G.G.C. has a property interest in the G&T Program Sibling Policy.

162.  As a gifted student, which affords her an automatic entry into the Anderson G&T Program upon her attainment of a particular score, G.G.C. has a property interest in her admission to the G&T Program.

163.  Defendants failed to adopt adequate notice and due process procedures in relation to (a) the Sibling Priority Policy, (b) the G&T Program Sibling Priority Policy; and (c) the application process and assessments in relation to the G&T Program.

164.  Defendants have no legally sufficient notice and appeals process in relation to the (a) the Sibling Priority Policy, (b) the G&T Program Sibling Priority Policy; and (c) the application process and assessments in relation to the G&T Program.

165.  First, the only appeals process that Defendants apparently have in relation to the G &T Program is one that allows Parents to "appeal" G&T assessment results within 48 hours after the test administration, despite the fact that scores are not released until two months later and evidence of improper administration is not available.

166.  Further, Defendants did not provide adequate written notice of even this limited appeals process to G.G.C.'s parents.

167.  Further, Defendants did not provide notice of testing protocols and conditions to parents (including the parents of G.G.C.) that would allow them to try to speak to their four-year-old children about the testing administration and identify potential issues.

168.  Four-year-old children (even gifted ones) do not have the skills, expertise, knowledge, or presence of mind to outline the ways in which they were aggrieved and/or the testing administration errors that might have been made during the G&T test administration.

169.  Thus, this limited 48 "appeal" is not an appeal process at all.  It is so flawed as to be in contravention of the most basic tenets of both procedural and substantive due process.

170.  In addition to the fact that results are not provided until two months later, parents are not allowed to see their child's exam until June.  It is not until the exam is reviewed that parents have access to some of the test protocols.

171.   By that time, all of the G&T applications for the 2015-2016 school year already have been submitted and seats have been secured.

172.   The Defendants do not have any appeals process that runs after the scores are received or tests are reviewed.

173.   Thus, there is no way for Parents to meaningfully obtain review and/or due process in relation to legitimate challenges to the administration and scoring of the entrance examination.

174.   A parent would not know if their child's test was improperly administered or mis-scored during the 48 hour "appeal" period. Thus, there is no actual opportunity for a parent to challenge the scoring of the test, making the process arbitrary and capricious and contrary to a parent's due process rights.

175.   Additionally, four and five year old children taking the G&T assessment do not have the skills or presence of mind to outline ways in which they were aggrieved during the G&T administration and testing process within a 48 hour period.

176.   According to the DOE's own stated policies and procedures, there is no process available to parents for challenging errors and inconsistencies that a parent discovers upon reviewing their child's exam in June.

177.   Defendants do not provide any guidelines or protocols for testing or administration of the test, so parents would not know if they had been harmed until at least April 6, 2015, when they receive their child's test scores.

178.   The appeal process that the DOE has laid out for parents is completely irrational and patently unfair on its face.

179.  With respect to both sibling policies and the G&T Program admission process generally, G.G.C. and her parents have been denied a meaningful appeal process.

180.  Thus, G.G.C. has been denied and is being denied her property interests without due process of law.

181.  Further, Defendants have failed to enforce their own regulation Chancellor's Regulations A-101, which affords G.G.C. the right to invoke her Sibling Priority Policy to attend the school that C.C. attends.

182.   The procedures and processes offered by the Defendants are arbitrary and capricious and violates New York Education Law § 310, as the Parent could never exhaust its underlying administrative due process.

183.  On June 1, 2015, Plaintiffs (through their attorney that is representing them on the Commissioner's Petition) ("Petition Counsel") advised Defendants' counsel that G.G.C. was entitled to a re-test based upon the breach of the testing protocols and requested a retest.

184.  Further, on June 4th, Plaintiff's Petition Counsel notified Defendants' counsel in a detailed email, the details of the test review and requested to have G.G.C. re-tested.

185.  On June 6, 2015, the Defendants' counsel responded and denied the request for a retest stating only that her clients is "content to let the litigation run its course".

**Plaintiffs Should not be Required to Exhaust Their Administrative Remedies, as the Administrative Process Will be Futile and Ineffective for Plaintiffs**

186.   Plaintiffs are not required to exhaust their administrative remedies for several reasons.

187.  G.G.C.'s situation presents an emergency and irreparable harm; further exhaustion will be futile.

188.  Plaintiffs are not required to further exhaust their administrative remedies, as they have attempted to do so and received no response to the Commissioner.

189.  The current State Education Commissioner's system is fraught with delays.

190.  Historically it can take several months to resolve appeals to the commissioner.

191.  Now, given the extensive delays at the State Education Commissioner as there is a new commissioner who has just been appointed, the timeframe is likely to be longer.

192.  In addition, Plaintiffs are not required to exhaust their administrative remedies to the extent that they raise systemic policy and practice claims.

## CAUSES OF ACTION

193.  Defendants have deprived and continue to deprive G.G.C of a property interests afforded to them via state law and Defendants' municipal policies.

194.   Defendants have deprived and continue to deprive G.G.C of a property interests and rights secured by the 14th Amendment to the Constitution without Due Process of Law in violation of 42 U.S.C. § 1983.

195.  Defendants has violated procedural due process by failing to provide reasonable notice and an opportunity to be heard; and the DOE has violated substantive due process by depriving families of a significant property rights in education, such as Sibling Priority Policies and the G&T Program for arbitrary reasons.

196.  Defendants have violated and continue to violate Plaintiffs' Procedural Due Process Rights by failing to provide an appropriate notice and a hearing before depriving Plaintiffs of their

property interests in the sibling priority policies and the G&T Program in violation of the Due

Process Clause of the 14th Amendment.

197.  Defendants have violated and continue to violate Plaintiffs' Procedural Due Process

Rights by failing to provide an appropriate notice and a hearing before depriving Plaintiffs of their

property interests in the sibling priority policies and the G&T Program in violation of 42 U.S.C. §

1983.

198.  Defendants further violated Plaintiffs' Substantive Due Process rights by failing to have

adequate policies, procedures, protocols, and training and further, to ensure that the long-standing

provisions of the Chancellors Regulation A101 were being implemented.

199.  Defendants have failed to implement their own regulations and afford G.G.C. admission

to C.C.'s school under the Sibling Priority policy.

200.  Defendants have violated the rights of the Plaintiffs under New York State Education

Law §§ 3202, 3203, 4401, 4404 and 4410 and § 200 of the Regulations of the New York State

Commissioner of Education, 8 N.Y. Comp. Codes R. Regs. § 200.

## RELIEF

WHEREFORE, Plaintiffs request that the Court:

      i.    Issue a TRO and a preliminary injunction enjoining Defendants from depriving

           Plaintiffs of their right to invoke the Sibling Priority Policy under A-101 and

           directing them to admit G.G.C. into C.C.'s school for the 2015-2016

           kindergarten class;

ii.  In the alternative, issue a TRO and a preliminary injunction enjoining Defendants from depriving Plaintiffs their right to invoke the G&T Sibling Priority Policy and directing them to admit G.G.C. into C.C.'s school for the 2015-2016 kindergarten class, or in the alternative, If the court finds no right to enroll in Anderson, provide G.G.C. with admission to PS 452.;

iii.  In addition and/or in the alternative, issue a TRO and a preliminary injunction, directing Defendants to (a) allow G.G.C. to re-take the OLSAT portion of the G&T test provided with the appropriate testing protocols including breaks and untimed testing conditions along with an experienced testing proctor; (b) score the OLSAT accurately utilizing proper norms and age bands/ranges; and (c) admit G.G.C. into the Anderson school for the 2015-2016 kindergarten class if she meets the cut-off score after the retest;

iv.  Enjoin Defendants from filling all available seats in Anderson and/or C.C.'s school until such time as this Court issues a determination with respect to the issues raised by Plaintiffs;

v.  Issue a declaratory judgment ruling that the Defendants violated the laws as set forth herein and finding that G.G.C. is eligible for enrollment in Anderson and C.C.'s school based on Chancellor's Regulation A-101 and the G&T Sibling Priority Policy;

vi.  Issue a final judgment determining that (a) G.G.C is eligible to enroll in C.C.'s school for the 2015-2016 kindergarten class; (b) G.G.C. is eligible to enroll in

Anderson for the 2015-2016 kindergarten class; (c) Defendants should offer

G.G.C. a retest for the OLSAT portion of the G&T admissions test and, if she

meets the criteria on her own, to enroll her in Anderson;

vii.    Award Plaintiffs their costs and attorney's fees; and

viii.   Grant such other and further relief as may be appropriate.

Dated:       August 28, 2015,
             New York, New York

Respectfully submitted,

By_____
Paula A. Rogowsky Cohen
156 W.86th Street
NY, NY 10024
Ph: 917-224-9527
Paulacohen11@gmail.com

31